**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| NEW CINGULAR WIRELESS PCS, LLC, <br> d/b/a AT&T MOBILITY, | ) <br> ) <br> ) | |
| Plaintiff, | ) | No. _____ |
| | ) | |
| vs. | ) <br> ) | |
| | ) | |
| THE VILLAGE OF <br> PALMYRA, NEBRASKA | ) <br> ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>COMPLAINT</u>**

This action arises out of the unlawful denial of Plaintiff's Application For Conditional Use Permit - Tower Development Permit ("Application") for a wireless communications facility siting request by the Board of Trustees of the Village of Palmyra, Nebraska (the "Board"). Plaintiff, New Cingular Wireless PCS, LLC, d/b/a AT&T Mobility ("AT&T"), for its complaint alleges as follows:

1. The Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* (the "Telecommunications Act" or the "1996 Act") preempts State and local decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services," and requires that State and local decisions denying requests to place personal wireless service facilities, such as cell towers, be supported by substantial evidence contained in a written record. 47 U.S.C. § 332(c)(7)(B). The Board violated § 332(c)(7)(B) when it denied AT&T's Application for permission to construct a Three Hundred and Twenty Foot (320') wireless communications guyed

tower along with ground equipment and fencing (the "Facility") at 915 F Road, Palmyra, Nebraska (the "Site")[1]

2.      AT&T seeks to install the Facility at the Site in order to remedy a significant and substantial gap in its personal wireless service coverage in the area. AT&T considered numerous potential locations for the proposed Facility, but each of the alternatives proved infeasible. AT&T's proposal to place the Facility at the Site is the only feasible option for filing the significant gap in coverage in the area.

3.      The Board's denial of AT&T's Application was not based on substantial evidence contained in a written record, as required by 47 U.S.C. § 332(c)(7)(B)(iii).  In addition, the Board's denial prohibits or has the effect of prohibiting AT&T's provision of personal wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i).  AT&T thus seeks all appropriate relief pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

## THE PARTIES

4.      Plaintiff New Cingular Wireless PCS, LLC, d/b/a AT&T Mobility (referred to hereinafter as "AT&T") is a Delaware limited liability company certificated to conduct business in the State of Nebraska and operates wireless communications facilities throughout the State. New Cingular Wireless PCS, LLC, is indirectly wholly owned by AT&T Inc., which through its operating subsidiaries provides wireless communication services nationwide.

5.      Defendant is a Village in Otoe County, Nebraska governed by a Board of Trustees as provided under Neb. Rev. Stat. § 17-201 and 17-203.

---

[1] West ½ of the SW ¼ of the SE ¼ of Section 26, T9N, R9E, Otoe County, NE Parcel ID 004037500.

14964961

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to (a) section 332(c)(7)(B)(v) of the Telecommunications Act because AT&T has been adversely affected and aggrieved by the Board's denial of its Application and (b) 28 U.S.C. § 1331 because this action presents a federal question under the Telecommunications Act.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this Judicial District and the events and/or omissions giving rise to AT&T's claims arose in this Judicial District.

## FACTS

### I. Background

8.     AT&T provides wireless voice and data products and services to customers nationwide, including "personal wireless services" within the meaning of Section 332 of the Telecommunications Act, 47 U.S.C. § 332 (c)(7)(c).

9.     The licenses authorizing AT&T to provide wireless service in the Village were issued by the FCC pursuant to the Telecommunications Act of 1996, as amended (the "Act")[2] The Act establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination . . . a rapid, efficient, Nation-wide and worldwide wire and radio communications service with adequate facilities at reasonable charges for the purposes of national defense [and] for the purpose of promoting safety of life and property through the use of wire and radio communications."  47 U.S.C. § 151.

10.     From 2007 to 2019, the number of wireless users increased from more than 255 million to over 404 million.[3] According to a 2019 National Health Interview Survey conducted by

---

[2] Telecommunications Act of 1996, Pub. LA. No. 104-104, 110 Stat. 56 (1996).
[3] CTIA 2019 Annual Survey Highlight and https://www.theglobaleconomy.com/, January, 2020.

14964961

the National Center for Health Statistics, 60.3% of American households were wireless only.[4]   At present, the number of landline telephone subscribers across the nation is declining every year while the number of wireless subscribers increases.[5]

11.     For many Americans, wireless devices have become an indispensable replacement for traditional landline telephones.  Even when Americans maintain both types of service, they are opting increasingly to use wireless devices over their landline telephone.  From 1996 to 2004, Americans more than quadrupled their time spent talking on their cell phones while markedly reducing the number of long distance and local calls made on traditional land lines.  The number of minutes wireless customers spent on their phone increased by 29% from 2018 to 2019 alone. In 2019, American wireless subscribers spent a total of 3.1 trillion minutes talking on the phone.[6]

12.     For Americans living in "wireless only" homes and working in "wireless only" businesses, cell phones are their only lifeline in emergencies.  Since 2006, the number of 9-1-1 calls made by people using wireless phones has grown from around 50 million a year to over 240 million annually.  Industry experts estimate that approximately 80% of those 9-1-1 calls are placed from cell phones and the percentage is growing.[7]

13.     To meet the policy goals established by Congress, and provide personal wireless services to local businesses, public safety entities, and the general public, AT&T must consistently update its technology, facilities, and network to keep up to date with customers' ever-growing demand for mobile services, including mobile data service and wireless phone coverage.  Among

---

[4] Blumberg SJ, Luke JV. Wireless substitution: Early release of estimates from the National Health Interview Survey, July-December 2019. National Center for Health Statistics. September 2020. Available from: https://www.cdc.gov/nchs/nhis.htm.
[5] *Id*.
[6] https://www.statista.com/2020.
[7] CTIA 2019 Annual Survey Highlight.

other things, AT&T must create and maintain a network of "cell sites," each of which consists of antennas and related equipment designed to send and receive radio signals.

14.     Wireless devices using all-digital technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure.  The antennas feed the signals to electronic devices housed in a small equipment cabin or base station.  The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to a base station controller subsequently routing the calls throughout the world.

In order to provide reliable service to a user, coverage must overlap in a grid pattern resembling a honeycomb.  In order for the entire network to be operational, there must be properly placed cell sites installed and functioning so that reliable coverage can be realized.  Only when the entire system is operational will a user have service and be able to partake in uninterrupted conversations throughout a given territory.  If there is no functioning cell site within a given area, there would be no service for customers within that area and mobile customers who travel through the area will experience an unacceptable level of dropped calls.

15.     When there is a need to improve coverage in a specific area, AT&T's engineers produce a search ring, identifying the area within which a wireless facility of the necessary height must be located or upgraded.  The study takes into account the topography of the land, the coverage boundaries of neighboring cells, and other factors.  For low power signals such as the wireless signals at issue here, there must be an unobstructed line of sight, thereby limiting the number of adequate sites at which a wireless facility may be located.

## II. AT&T's Contract with FirstNet

16.     The First Responder Network Authority ("FirstNet Network") of the United States was created under the Middle Class Tax Relief and Job Creation Act of 2012 (MCTRJCA) as an

5

independent authority within the National Telecommunications and Information Administration (NTIA).[8] The purpose of FirstNet Network is to establish, operate, and maintain an interoperable public safety broadband network that equips first responders to save lives and protect US communities[9].

17.     On March 30, 2017, Commerce Secretary Wilbur Ross announced that AT&T was awarded a twenty-five year contract to build and maintain the FirstNet network throughout the nation In December 2017, all 50 states opted into FirstNet Network's broadband network plan with AT&T.

18.     The Facility is needed to help AT&T enhance its wireless coverage and capacity for the FirstNet Network System in an area along US Highway 2 from Lincoln, Nebraska to Nebraska City, Nebraska and is specifically designed for the proposed Site in Palmyra, Nebraska.

19.     AT&T has a significant gap in its wireless network coverage in the area along Highway 2 between the eastern edge of Lincoln near Cheney extending eastward to the City of Syracuse, Nebraska.

20.     Placing the proposed Facility at the Site would alleviate the significant gap in AT&T's wireless coverage along Highway 2.  The Site is centrally located within the coverage gap and is zoned where communications facilities are permitted under the Village of Palmyra Zoning Ordinance ("Ordinance").[10]

---

[8] https://apps.fcc.gov/edocs_public/attachmatch/DOC-319266A1.pdf.
[9] *Id*.
[10] Village of Palmyra, Otoe County, Nebraska, *Zoning Ordinance No. 427* (Feb. 7, 2002) (Ex. A).

### III.  AT&T'S Application for the Facility

21.      Under the Ordinance, telecommunications towers  and facilities may be constructed as a conditional use of land only in zoning districts specifically listed in the Ordinance[11]  The Ordinance also requires the proposed tower to meet certain, minimum set-backs, separation and buffer requirements and comply with certain landscaping, illumination and fencing requirements.[12]

22.      The Ordinance requires the Owner of the tower to submit an Application for a Tower Development Permit to the Zoning Administrator for approval by the Planning Commission and the Village Board and to pay a filing fee in accordance with the Section 4.23 of Ordinance.[13]

23.      AT&T's application demonstrated that it met all requirements in the Ordinance.

24.      Further, AT&T demonstrated that the Facility would address the substantial and significant gap in coverage in the area along Highway 2, east and west of Palmyra

25.      The search for an acceptable alternative site included researching any existing tall structures (buildings, other towers, water towers) within one mile of the proposed location.

26.      When attempting to remedy a gap in service coverage, AT&T seeks where possible to co-locate its antenna facilities on existing towers or other existing suitable structures.

27.      In this situation, there is no existing tower or other tall structure upon which AT&T could co-locate its facilities in order to remedy the coverage gap.

### IV.  Applications and Hearings Before the Planning Commission and Board

28.      On September 25, 2019, AT&T filed an Application for Zoning Permit with the Zoning Administrator of the Village of Palmyra (the "Initial Application").[14]

---

[11] *Id*, p. 51.
[12] *Id* at Section 7.06 C-J.
[13]  *Id* at Section 7.06(C)(1) and E.
[14] On Behalf of AT&T Mobility, Zoning Permit Proposal for Village of Palmyra, Nebraska, Sept. 25, 2019 (Ex. B).

7

14964961

29.    The Planning Commission recommended approval of the Initial Application on October 16, 2019.[15]

30.    The Board met on November 14, 2019 and denied the Initial Application due to failure to comply with setback requirements under the Ordinance.[16]

31.    On December 3, 2019 AT&T filed a request to the Planning Commission to amend the Ordinance to permit a setback less than the height of the Tower.  On December 30, 2019 the Planning Commission recommended denial of the requested amendment to the Ordinance.[17]

32.    On February 13, 2020, the Board held a hearing on AT&T's request for an amendment to the setback provisions of the Ordinance ("the Amendment").  AT&T presented evidence at this hearing that provided ample authority and precedent to approve the Amendment.[18]

33.    The Board also heard from a resident, who owned land adjacent to the Site, and his counsel, who objected to the Amendment on the grounds that the failure of the Tower to meet existing setbacks would adversely affect the resident's future residential development of his adjoining property.  The Board then voted to deny the proposed Amendment based on the objections of the opposing land owner. [19]

34.    On April 8, 2020 AT&T filed a new Application for Zoning Permit for a Tower of 320 feet, reduced from 400 feet in the Initial Application, but located on the same Site, and on April 16, 2020 filed an Application for Conditional Use Permit/Tower Development Permit (collectively the "Second Application") with the Zoning Administrator of the Village of Palmyra.

---

[15] Minutes of the Village of Palmyra, Nebraska Planning and Zoning Commission Regular Meeting, Oct. 16, 2019 (Ex. C).
[16] Minutes of the Board of Trustees of the Village of Palmyra, Nebraska, Regular Meeting, Nov. 14, 2019 (Ex. D).
[17] Minutes of the Village of Palmyra, Nebraska Planning and Zoning Commission, Public Hearing, Dec. 30, 2019 (Ex. E).
[18] Minutes of the Board of Trustees of the Village of Palmyra, Nebraska, Regular Meeting, Feb. 13, 2020 (Ex. F).
[19] *Id*

14964961

The Tower location was shifted approximately 65 feet to the northeast to accommodate the existing setback rules in the Ordinance.

35.     The Planning Commission approved the Second Application at a virtual meeting on June 4, 2020, where the adjacent land owner objected both to the Second Application and to alleged inadequate notice of the meeting, both of which objections were rejected by the Planning Commission.[20]

36.     On July 9, 2020, the Board tabled further discussion of Second Application due to the absence of the Village Attorney due to National Guard duties. The opposing land owner, through counsel, argued that (i) no towers should be permitted in the Transition Ag Zoning District, (ii) the Tower would have adverse effect on future development of surrounding property, (iii) the proposed tower should be moved to another Site, (iv) the Tower would have adverse effect on drainage on adjoining land, and (v) the Tower would not financially benefit the Village of Palmyra.[21]

37.     On August 13, 2020 the Board reconvened to consider the Second Application. AT&T presented evidence that contradicted each of the issues raised by the opposing land owner. The Board voted to table the matter until the next month's meeting.[22]

38.     On September 10, 2020 the Board met again to discuss the Second Application. Additional evidence was presented by AT&T supporting the Second Application and the adjacent land owner once again, through counsel, opposed the Second Application, but only on the basis of its site location.[23]  On a motion to approve the Application, the motion was defeated.[24]

---

[20] Minutes of the Village of Palmyra, Nebraska Planning and Zoning Commission Public Hearing and Regular Meeting, June 4, 2020 (Ex. G).
[21] Minutes of the Board of Trustees of the Village of Palmyra, Nebraska, Regular Meeting, July 9, 2020 (Ex. H).
[22] Minutes of the Board of Trustees of the Village of Palmyra, Nebraska, Regular Meeting, Aug. 13, 2020 (Ex. I).
[23] Minutes of the Board of Trustees of the Village of Palmyra, Nebraska, Public Hearings and Regular Meeting, Sept. 10, 2020 (Ex. J).
[24] *Id.*

14964961

39.     At all Board Meetings from and after September 10, 2020, consideration of the Minutes of the September 10, 2020 meeting was waived at the request of the Village Attorney while AT&T initiated discussions regarding the reconsideration of the Second Application.[25]

40.     On January 14, 2021, the Board approved the Minutes of its September 10, 2020 meeting denying the Second Application, even though all objections to the Second Application had been refuted by AT&T (the "Denial").  Attached hereto as Exhibit K is a true and correct copy of the Board's final decision denying Plaintiff's Application for the Conditional Use Permit - Tower Development Permit ("Permit").

## COUNT I

### (The Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7) - Substantial Evidence)

41.     AT&T incorporates by reference the allegations in each of the paragraphs set forth above.

42.     Although the 1996 Act preserves local zoning authority over the siting of wireless facilities, 47 U.S.C. § 332(c)(7)(A), "the method by which siting decisions are made is now subject to judicial oversight."  *Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 493 (2d Cir. 1999).  "Therefore, denials subject to the Act are reviewed by a court more closely" than other zoning decisions.  *Id.*  Among other things, "[i]f a [municipal] decision is not supported by substantial evidence, § 332(c)(7)(B)(iii), or if it effectively prohibits the provision of wireless service, § 332(c)(7)(B)(i)(II), then under the Supremacy Clause of the Constitution, local law is pre-empted in order to effectuate the Act's national policy goals."  *Second Generation Props. L.P. v. Town of Pelham*, 313 F.3d 620, 627 (1st Cir. 2002).

---

[25] Actions at any board meeting do not become final until the minutes of such meeting are approved at a subsequent meeting of the board.

14964961

43.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

44.     The Board's Denial the Second Application violates 47 U.S.C. § 332(c)(7)(B)(iii) because it is not supported by substantial evidence in a written record.  The record does not contain substantial evidence to justify the Denial of the Second Application by the Board on January 14, 2021.

45.     The Board's Denial has caused and will continue to cause AT&T irreparable harm.

46.     AT&T is entitled to relief under the Telecommunications Act ordering the Board to approve the Second Application

## COUNT II

**(The Federal Telecommunications Act of 1996,
47 U.S.C. § 332(c)(7) - Effective Prohibition)**

47.     AT&T incorporates here by reference the allegations in each of the paragraphs above.

48.     Local authority over zoning and land use matters cannot be used to "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

49.     The Telecommunications Act requires local zoning authorities to allow carriers to fill significant gaps in the coverage of their wireless networks.

50.     AT&T has a significant and substantial gap in its wireless network coverage and provision of personal wireless services in the Village of Palmyra, Nebraska.

11

51.     AT&T's proposed Facility at the Site represents the only feasible and least intrusive means of remedying AT&T's significant gap in its personal wireless services coverage.

52.     The Board's Denial of the Second Application violates Section 332(c)(7)(B)(i). The Denial of AT&T's Second Application has the effect of prohibiting the provision of personal wireless service in the relevant area.

53.     The Board's Denial has caused and will continue to cause AT&T irreparable harm.

54.     AT&T is entitled to relief under the Telecommunications Act ordering the Board to approve the Second Application and issue the Tower Development Permit and any other permits required to install, operate, and maintain the Facility.

## PRAYER FOR RELIEF

WHEREFORE, AT&T respectfully prays that this Court grant it relief as follows:

1.     Permit expedited review of the matters set forth in this Complaint as required by 47 U.S.C. § 332(c)(7)(B)(v);

2.     Enter an order declaring that the Board's Denial violates and is preempted by 47 U.S.C. § 332(c)(7);

3.     Enter an order requiring the Board to approve AT&T's Second Application and authorize AT&T to install its proposed Facility at the Site and to issue all other permits required to install, operate, and maintain the Facility; and

4.     Order such other relief as the Court deems appropriate.

Dated: February 3, 2021

Respectfully submitted,

NEW CINGULAR WIRELESS PCS, LLC,
d/b/a AT&T MOBILITY

s/ Loel P. Brooks
Bar #15352

12

14964961

Brooks, Pansing Brooks, PC, LLO
1248 O Street, Suite 984
Lincoln, Nebraska 68508
(402) 476-3300
(402) 476-6368
lbrooks@brookspanlaw.com

*ATTORNEY FOR PLAINTIFF*

13